**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

———————————————————————

NACHAY MALDONADO-TORRES,

                         Plaintiff

    v.

CUSTOMIZED DISTRIBUTION
SERVICES, INC.,

                        Defendant.

———————————————————————

:
:          CIVIL ACTION
:
:          NO. 19-0400
:
:
:
:
:
:
:

**Henry S. Perkin, M.J.**                                    **September 21, 2020**

## MEMORANDUM

Presently before the Court are Defendant's Motion for Summary Judgment (ECF No. 34), Plaintiff's Response in Opposition to Defendant's Motion for Summary Judgment (ECF No. 35), Defendant's Reply Brief in Support of its Motion for Summary Judgment (ECF No. 38), and Plaintiff's Sur-Reply in Further Opposition to Defendant's Motion for Summary Judgment (ECF No. 44). For the reasons set forth below, the Motion for Summary Judgment is **DENIED.**

### I.  FACTUAL BACKGROUND

#### A.  Plaintiff's Employment

On June 30, 2014, Plaintiff Nachay Maldonado-Torres began working for Customized Distribution Services, Inc. ("CDS") in its Breinigsville, Pennsylvania distribution center. (ECF No. 34-1 ¶ 3; ECF No. 35-1 ¶ 3.) CDS provides, *inter alia*, warehousing and logistics services to a variety of customers. (ECF No. 34-1 ¶ 2.) The Breinigsville facility ships consumer goods products to a variety of large retailers throughout the county. *Id.*

The parties dispute the exact title of Plaintiff's position. Defendant contends that Plaintiff worked as, and applied for a position as, a "Warehouse Operator." (ECF No. 34-1 ¶ 3.) Plaintiff maintains that her badge read "Forklift Operator" and believes that to have been her title. (ECF No. 35-1 ¶ 3).  Regardless of Plaintiff's title, her general duties included unloading trucks and collecting boxes and cases of products that were stored in the warehouse and then shipped to customers. (ECF No. 35 at 1.) At times, Plaintiff performed the more physically

demanding task of "case picking" where she was required to travel around the distribution center and pick cases from pallets to assemble a customer's order. (ECF No. 34-1 ¶ 6; ECF No. 35-1¶ 6; ECF No. 35 at 1.) Plaintiff's responsibilities also included operating machinery, such as forklifts, to pick up and move merchandise around the distribution center. (ECF No. 34-1 ¶ 7; ECF No. 35 at 1.)[1] Plaintiff's then-supervisor, Jeffrey Passaro[2], testified that a significant part of Defendant's business entailed completing work with a forklift and that Defendant had tasks that needed to be completed with a forklift on a daily basis. (ECF No. 35-1 ¶ ¶ 5-6.)

According to the "Warehouse Operator" sample job description submitted by Defendant, physical demands of the position required the employee to regularly: sit for extended periods of time; use hands to finger, handle, touch or manipulate items; speak and/or hear, stand for extended periods, walk, and reach with hands or arms; occasionally stoop, kneel, or crouch; lift up to fifty (50) pounds repeatedly; and stoop, reach, kneel, twist, and walk which include handling cases of product. (ECF No. 34-3 at 193.) The description specifies that "[r]easonable accommodations may be made to enable individuals with disabilities to perform the essential functions." *Id.* Plaintiff affirmed that, when required to lift merchandise manually, she would lift packages ranging from ten (10) to fifty (50) pounds. (ECF No. 34-1 ¶ 9: ECF No. 35-1 ¶ 9.) If an employee could not lift a box, they had the option to ask a coworker for help and could utilize pallet jacks for case picking. (ECF No. 35-1 ¶ ¶ 8-9.)

### B.  Wrist Injury and Light Duty

On September 24, 2014, Plaintiff injured her wrist while working. (ECF No. 34-1 ¶ 13; ECF No. 35-1¶ 13.) After an evaluation, Plaintiff's medical provider allowed her to return to work with the following restrictions: no pushing, pulling, or lifting greater than ten (10)

---

[1] Consistent with the "Warehouse Operator" sample job description, "essential duties and responsibilities" of the position included: comply with the Company's attendance/tardiness standards; operate several types of forklifts to load and unload products in a safe and accurate manner; maintain a competency and certification concerning the safe operation of the different forklifts; operate various types of equipment in the warehouse, including RF Scanners and Pallet Jacks; pick orders for transport; maintain an inventory of all products and verify that the correct quantity is being shipped to clients; stack products in the appropriate location; assess all products and pallets and notify supervisor of damage; work on scheduled shifts and overtime; perform the receiving, loading, and order selection process as assigned by the Operations Supervisor and/or Manager; comply with established procedures concerning equipment inspection an sign-out; assist with the training of newly hired personnel; participate with the general housekeeping of warehouse daily; and comply with company policies, procedures, and expected standards of behavior.  (ECF No. 34-3 at 193.)

[2] As discussed further below, Plaintiff reported to multiple supervisors including Jeffrey Passaro and Manny Coble.

pounds; no use of vibrating hand, power, or air tools; and no pinching or performing tight fist, gripping activities. (ECF No. 35-11at 12.) Defendant accommodated Plaintiff's restrictions with light duty work which included tasks such as: labeling products, doing inventory, verifying pallets in the checker, helping in the Rack 10 section of the warehouse, doing displays, and helping the clerks with documentation that drivers needed. (ECF No. 34-1 ¶ 25; ECF No. 35-1 ¶ 25; ECF No. 35 at 3.) While on light duty, Defendant did not require Plaintiff to case pick. (ECF No. 35 at 3.) On January 6, 2015, Plaintiff's provider released her to work without restrictions relating to her wrist injury. (ECF No. 35-11 at 2.)

### C.  Plaintiff's Pregnancy

In December 2014, Plaintiff learned that she was pregnant via a home pregnancy test. (ECF No. 35-1 ¶ 31.) Plaintiff testified that, when she called her physician's office to schedule her first prenatal appointment, the person to whom she spoke informed her that she should not lift greater than twenty-five (25) pounds due to her pregnancy. (ECF No. 34-1 ¶ 36; ECF No. 35-1 ¶ 34.) On January 5, 2015, Plaintiff notified Martha Vargas, Human Resources Representative, that she was pregnant. (ECF No. 34-1 ¶  40; ECF No. 35-1 ¶ 40.) According to Plaintiff, she inquired as to whether she would need to provide Defendant with a certification of her pregnancy and restrictions. (ECF No. 35-1 ¶ 34.) Because Plaintiff was already on light duty due to her wrist injury, Vargas responded that Plaintiff would not need to provide any such certification. *Id.* Vargas testified that, during this conversation, Plaintiff brought up the topic of leave under the Family and Medical Leave Act ("FMLA") and told Vargas that she would let her know whether she would request such leave in connection with her pregnancy. (ECF No. 34-1 ¶ 40.) Plaintiff disputes this as she claims that she had no prior knowledge of what FMLA was. (ECF No. 35-1 ¶ 40.)

On January 7, 2015, Plaintiff visited a hospital for abdominal pain. (ECF No. 34-1 ¶ 30; ECF No. 35-1 ¶ 30.) Plaintiff's patient visit summary confirmed that she was in her first trimester of pregnancy and released her to work without specifying any restrictions due to her pregnancy. (ECF No. 34-1 ¶¶ 31-32.)  The following day, Plaintiff returned to CDS and provided her supervisor, Manny Coble, with a certification from her hospital visit indicating that she was pregnant. (ECF No. 34-1 ¶¶ 42-44; ECF No. 35-1 ¶¶ 42-44; ECF No. 35 at 3.) Plaintiff further notified Coble that she no longer had light duty restrictions due to her wrist injury. *Id.* Coble

subsequently assigned Plaintiff to case picking for the day and she requested a different task. (ECF No. 34-1 ¶ 43; ECF No. 35-1 ¶ 44.) In response to Coble inquiring about the reason for this request, Plaintiff responded that she was pregnant and could not lift more than twenty-five (25) pounds. (ECF No. 34-1 ¶ 44; ECF No. 35-1 ¶ 44.) Plaintiff testified that she then asked Coble if she would need a note from her physician confirming her lifting restrictions and he replied that he would have to find out as pregnancy was "something personal." (ECF No. 35-1 ¶ 45.)

Plaintiff then met with Sherry Nakata, Operations Manager, and Jeffrey Passaro in Nakata's office. (ECF No. 34-1 ¶ 45; ECF No. 35-1 ¶ 45.) Passaro asked Plaintiff why she had requested a different assignment and she answered that case picking requires lifting more than twenty-five (25) pounds, an activity that she could not do because of her pregnancy. *Id.* At that point, Nakata told Plaintiff that they did not have light duty assignments available to accommodate Plaintiff's restrictions. (ECF No. 34-1 ¶ 46; ECF No. 35-1 ¶ 46.) In her deposition, Nakata stated that, even though she knew during the meeting that there were no light duty assignments available for Plaintiff, she verified this assertion by checking with the warehouse managers and supervisors afterwards. (ECF No. 34-1 ¶¶ 46-47.) Plaintiff testified that Nakata also informed her that the reason they could not accommodate her request was that Defendant granted light duty only to those who sustained work-related injuries and that, because pregnancy was something personal, they would not accommodate her request for a personal reason. (ECF No. 35-1 ¶ 46.) Plaintiff further swore that Passaro confirmed this statement. (ECF No. 35-1 ¶¶ 16, 46.)

At the end of the meeting, Nakata testified that she spoke with Travis Gaito, Human Resources Manager, relaying the information she learned and affirming that she did not have any light duty work assignments available for Plaintiff. (ECF No. 34-1 ¶ 48.) Gaito confirmed that Nakata could send Plaintiff home for the day so Nakata instructed Plaintiff to "punch out" of work early and leave. (ECF No. 34-1 ¶ 49; ECF No. 35-1 ¶ 49.)

**D.  FMLA**

On January 12, 2015, Nakata instructed Plaintiff to come to her office to obtain FMLA paperwork. (ECF No. 34-1 ¶ 52; ECF No. 35-1 ¶ 52.) According to Plaintiff's deposition, Nakata informed Plaintiff that FMLA leave was the only option Defendant could provide to Plaintiff as Defendant could not accommodate Plaintiff's light duty request due to her "personal

situation" of pregnancy. (ECF No. 35-1 ¶ 52.) Plaintiff further testified that, although she had no knowledge of FMLA and did not apply for leave on her own, Nakata had processed Plaintiff's FMLA paperwork and presented it to her in a sealed envelope. *Id.* When receiving the documents, Plaintiff told Nakata that she did not want to take a leave of absence. *Id.* Despite this, Nakata instructed Plaintiff to deliver the envelope directly to her physician and return to Nakata sealed. *Id.[3]* On the day Plaintiff received the FMLA paperwork, Nakata testified that she did not recall whether there was any light duty work available for Plaintiff nor did she recall checking whether any such work was available. (ECF No. 35-1 ¶ 19.)

Plaintiff visited Seasons of Life Obstetrics and Gynecology on January 13, 2015 and January 23, 3015 and was treated by Dr. Stephanie Eckert on both occasions. (ECF No. 34-1 ¶ 53; ECF No. 35-1 ¶ 53.)  Dr. Eckert completed Plaintiff's FMLA paperwork during these visits and indicated that, based on Plaintiff's job description and essential employee functions, she was unable to lift fifty (50) pounds repeatedly due to her pregnancy. (ECF No. 34-3 at 210.) Dr. Eckert further noted that Plaintiff could return to work on April 1, 2015 with lifting restrictions and then be released from restrictions "after post-partum."[4] *Id.* In the section "ADDITIONAL INFORMATION," Dr. Eckert wrote that Plaintiff was "available to work, willing to work, but medically cannot lift, push or pull (without assistance/pallet jack/hand jack) > 25 lbs." *Id.* at 211.

Sometime before January 26, 2015, Plaintiff returned the sealed envelope to Martha Vargas. (ECF No. 34-1 ¶ 58; ECF No. 35-1 ¶ 58.)  Plaintiff testified that she asked Vargas why she was being made to take FMLA leave despite being able to work and Vargas responded, "that's what [Defendant] decided." (ECF No. 35 at 5-6.) On February 6, 2015, Travis Gaito informed Plaintiff, via letter, that CDS had approved her FMLA leave from January 9, 2015 through April 12, 2015. (ECF No. 34-1 ¶ 59; ECF No. 35 at 6.)

During Plaintiff's leave, light duty assignments were available. (ECF No. 34-1 ¶ 71; ECF No. 35-1 ¶ 71.)  Defendant provided light duty to two CDS employees, Wilfredo Reyes and Ruthann Brooks, who each had medical restrictions at the time. (ECF No. 34-1 ¶ 72; ECF

---

[3] With respect to the meeting between Plaintiff and Nakata regarding FMLA, Defendant claims only that Plaintiff "came into CDS to pick up some documents related to FMLA leave from Ms. Nakata" on January 12, 2015. (ECF No. 34-1 ¶ 52.)

[4] Where the FMLA form asked for the probable duration of condition, Dr. Eckert wrote "[Expected delivery date]: 7/24/15 + 6-8 wk postpartum depending on delivery." (ECF No. 34-3 at 210.)

No. 35-1 ¶ 72.)  Brooks was not permitted to lift, carry, push, or pull over fifteen (15) pounds, climb, operate a forklift or pallet jack, and was required to limit bending and twisting at the waist and reaching to less than four times per hour. (ECF No. 35-14.) On February 20, 2015, she received a modified duty job offer assigning her to scanning pallets. *Id.* Reyes could not lift, carry, push, or pull over five (5) pounds, operate a forklift or pallet jack, and was required to limit bending and twisting at the waist, reaching, squatting, climbing, and kneeling to less than four times per hour. (ECF No. 35-15.) On February 26, 2016, Reyes similarly received a modified duty job offer assigning him to scanning pallets. *Id.* In her deposition, Nakata acknowledged that Plaintiff could have performed the assignment of scanning pallets with her pregnancy-related restrictions. (ECF No. 35-1 ¶ 30.)

On April 9, 2015, Dr. Mary Greiss-Coult of Seasons of Life completed a return to work note for Plaintiff indicating that Plaintiff could return to work immediately with the following limitations: patient cannot lift, push or pull over twenty-five (25) pounds; patient cannot bend or climb. (ECF No. 34-3.) After receiving the note, Defendant sent Plaintiff a letter on April 17, 2015 requesting that her physician fill out a questionnaire with additional information. (ECF No. 35-6.) Dr. Eckert filled out the form, indicating that Plaintiff could not lift, push and/or pull over twenty-five (25) pounds, bend, or climb, and may require a break if standing for an extended period of time. (ECF No. 35-7.) In noting potential accommodations that may help Plaintiff perform her position, Dr. Eckert wrote "assistance with push, pull and lifting duties" and "position that may require sedentary activities." *Id.* Plaintiff thereafter emailed the completed questionnaire to Travis Gaito. (ECF No. 34-1 ¶ 69; ECF No. 35-1 ¶ 69.)  The following day, Plaintiff emailed Martha Vargas to inquire about the status of her job. (34-3 at 240.)

### E.  Plaintiff's Termination and Charge of Discrimination

On May 13, 2015, Gaito sent a letter to Plaintiff terminating her employment with Defendant. (ECF No. 35-9.) In the letter, Gaito stated that Defendant did not have any open positions that Plaintiff was qualified for that also met her current restrictions. *Id.* The letter further noted that, because Defendant was not able to accommodate Plaintiff, her last day of employment would be May 13, 2015. *Id.* Lastly, the letter informed Plaintiff that, though she had zero (0) hours left of job-protected leave under the FMLA as of April 13, 2015, Defendant had

provided additional job-protected leave under the ADA from April 13, 2015 through May 13, 2015. *Id.* In her deposition, Sherry Nakata testified that, though she responded to an email from Gaito indicating that there was no work that Plaintiff could perform pursuant to her job restrictions, she could not recall any of the steps she took to evaluate whether there was work available that could meet those restriction. (ECF No. 35-1 ¶ 32; Nakata Dep. 75:6-76:9.)

While on FLMA leave Plaintiff filed a charge of discrimination with the Pennsylvania Human Relations Commission ("PHRC") on February 5, 2015. (ECF No. 35-16.) In her complaint, Plaintiff alleged pregnancy discrimination based on Defendant's refusal to accommodate her pregnancy-related restrictions. *Id.* Following her termination, on July 14, 2015 Plaintiff filed a second Charge of Discrimination against Defendant. (ECF No. 44 at 4.)

## II.  **PROCEDURAL HISTORY**

On January 28, 2019, Plaintiff filed the underlying lawsuit, asserting two claims: Count I: Title VII – Sex/Pregnancy Discrimination, Retaliation, and Count II: PHRA – Sex/Pregnancy Discrimination, Retaliation. (ECF No. 1.) Defendant filed its answer on March 11, 2019, denying that it violated Title VII, the PHRA, or any other statue or law. (ECF No. 7.)

Defendant filed its Motion for Summary Judgment on all claims on December 23, 2019. (ECF No. 34)  On January 13, 2020, Plaintiff filed her Response in Opposition to the Motion for Summary Judgment. (ECF No. 35.)  The Court granted Defendant leave to file a Reply Brief, and Plaintiff leave to file a Sur-Reply, which were filed, respectively, on January 24, 2020 and February 13, 2020.  (ECF Nos. 38, 44.)

## III.  **LEGAL STANDARD**

Summary judgment is appropriate where the record and evidence, taken in the light most favorable to the non-moving party, show "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The essential inquiry is "whether the evidence presents a sufficient disagreement to require submission to the jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-252 (1986).  The moving party has the initial burden of informing the court of the basis for the motion and identifying those portions of the record that demonstrate the absence of a genuine issue of material fact.  *Celotex Corp. v.*

*Catrett*, 477 U.S. 317, 323 (1986).  An issue is genuine only if there is a sufficient evidentiary basis on which a reasonable jury could find for the non-moving party.  *Anderson*, 477 U.S. at 249.  A factual dispute is material only if it might affect the outcome of the suit under governing law.  *Id.* at 248.

      To defeat summary judgment, the non-moving party cannot rest on the pleadings, but rather, that party must cite "to particular parts of materials in the record" showing that there is a genuine dispute for trial.  Fed. R. Civ. P. 56(c).  Similarly, the non-moving party cannot rely on unsupported assertions, conclusory allegations, or mere suspicions in attempting to survive a summary judgment motion.  *Williams v. Borough of West Chester*, 891 F.2d 458, 460 (3d Cir. 1989) (citing *Celotex*, 477 U.S. at 325).  The non-moving party has the burden of producing evidence to establish prima facie each element of its claim.  *Celotex*, 477 U.S. at 322-323.  If the court, in viewing all reasonable inferences in favor of the non-moving party, determines that there is no genuine dispute as to any material fact, then summary judgment is proper.  *Id.* at 322; *Wisniewski v. Johns-Manville Corp.*, 812 F.2d 81, 83 (3d Cir. 1987).  When the non-moving party will bear the burden of proof at trial, the moving party's burden can be "discharged by 'showing' - that is, pointing out to the District Court - that there is an absence of evidence to support the non-moving party's case."  *Jones v. Indiana Area Sch. Dist.*, 397 F. Supp.2d 628, 642 (W.D. Pa. 2005) (quoting *Celotex*, 477 U.S. at 325).

## IV.  DISCUSSION

### A. Discrimination

      Title VII of the Civil Rights Act of 1964 prohibits an employer from discriminating "because of" or "on the basis of" sex, among other protected classes. *See* 42 U.S.C. § 2000e-2. In 1978, Congress enacted the Pregnancy Discrimination Act ("PDA"), amending Title VII's definition section to define the terms "because of sex" and "on the basis of sex" to include "because of or on the basis of pregnancy, childbirth, or related medical conditions." 42 U.S.C.A. § 2000e(k). The PDA further amended Title VII to specify that women affected by pregnancy, childbirth, or related medical conditions "shall be treated the same for all employment-related purposes . . . as other persons not so affected but similar in their ability or inability to work." *Id.* The Pennsylvania Human Relations Act ("PHRA") similarly makes it unlawful for an employer to discriminate against an employee on the basis of sex, which includes

pregnancy, childbirth, and other related medical conditions. *See* 43 Pa. Stat. Ann. § 955(a); *see also Cerra v. East Stroudsburg Area Sch. Dist.*, 299 A.2d 277, 279-80 (Pa. 1973). When a plaintiff alleges violations of Title VII and the PHRA, both claims are subject to the same analysis. *See Gomez v. Allegheny Health Servs., Inc.*, 71 F.3d 1079, 1083–84 (3d Cir.1995) (noting that PHRA and Title VII are interpreted similarly); *Kelly v. Drexel Univ.*, 94 F.3d 102, 105 (3d Cir. 1996) (Pennsylvania courts generally interpret the PHRA in accord with its federal counterparts); *Ogden v. Keystone Residence*, 226 F. Supp. 2d 588, 597 (M.D. Pa. 2002) (stating that the standards of proof for PHRA claim are "identical to the standards of proof for a Title VII case"). Accordingly, this Court will address Plaintiff's claims under Title VII and the PHRA pursuant to the Title VII standards.

Plaintiff contends that Defendant failed to accommodate her restrictions, and subsequently terminated her, due to Plaintiff's pregnancy. In advancing her claim, Plaintiff proceeds under a "disparate treatment" theory. Disparate treatment is a form of intentional employment discrimination which "occurs when an employer singles out a person or a group of employees and treats them differently than other employees who do not share the same protected classification." *Brown v. Aria Health*, No. CV 17-1827, 2019 WL 1745653, at *5 (E.D. Pa. Apr. 17, 2019)(citing *Ricci v. DeStefano*, 557 U.S. 557 (2009)). Disparate treatment discrimination is proven by either using "direct evidence of intent to discriminate or using indirect evidence from which a court could infer intent to discriminate." *Doe v. C.A.R.S. Prot. Plus, Inc*., 527 F.3d 358, 364 (3d Cir. 2008). If a plaintiff relies on indirect evidence to prove discrimination, the claim is analyzed under the burden shifting framework provided by *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).[5] *Kautz v. Met-Pro Corp.*, 412 F.3d 463, 465 (3d Cir. 2005).

---

[5] Plaintiff contends that the record establishes discrimination through both direct and indirect evidence. Evidence is direct when it "would prove the prohibited intent without resort to an inference or presumption." U.S. Equal Employ. *Opportunity Comm'n v. Bob Evans Farms, LLC*, 275 F.Supp.3d 635, 651 (W.D. Pa. 2017) (citing *Torre v. Casio, Inc*., 42 F.3d 825, 829 (3d Cir. 1994)). In order to constitute direct evidence, "the evidence must demonstrate that the 'decision makers placed substantial negative reliance on an illegitimate criterion in reaching their decision.'" *Anderson v. Consol. Rail Corp.*, 297 F.3d 242, 248 (3d Cir. 2002) (citations omitted.)

In the context of disparate treatment based on pregnancy, an example of evidence that would be considered "direct" is found in *Bob Evans* where the plaintiff, a pregnant employee, was removed from the automatic shift scheduling process. *Bob Evans*, 275 F.Supp.3d at 642. The plaintiff's manager testified that removal was due to employee's "imminent" need for leave, but the plaintiff had not requested leave. *Id.* at 655. The Court found that evidence, specifically the manager's testimony, made clear that the reason for the decision to remove the plaintiff from automatic scheduling was because she was pregnant and he believed her need for leave because of childbirth (and nothing else) was imminent. *Id.* In the instant case, as discussed further in this Court's analysis, Plaintiff has presented evidence from which the trier of fact must infer discrimination on the basis of pregnancy from

Under the *McDonnell Douglas* framework, the plaintiff has the initial burden of establishing a prima facie case of discrimination. *See* 411 U.S. at 802. If she carries her burden, the employer must have an opportunity "to articulate some legitimate, non-discriminatory reason[s] for" the adverse employment action. *Id.* If the employer articulates such reasons, the plaintiff then has "an opportunity to prove by a preponderance of the evidence that the reasons ... were a pretext for discrimination." *Young v. United Parcel Serv., Inc.*, 575 U.S. 206, 213 (2015).

### i.   Prima Facie Case

As discussed above, the second clause of the PDA states that "women affected by pregnancy, childbirth, or related medical conditions shall be treated the same for all employment-related purposes . . . as other persons not so affected but similar in their ability or inability to work...." 42 U.S.C.A. § 2000e(k). In *Young*, the Supreme Court revised the plaintiff's prima facie showing under the *McDonnell Douglas* burden shifting framework in pregnancy accommodation cases brought under this clause.[6] Now, a plaintiff alleging that the denial of an accommodation constituted disparate treatment under the PDA may make out a prima facie case by showing that: (1) she belongs to the protected class, (2) she sought accommodation, (3) the employer did not accommodate her, and (4) the employer did accommodate others "similar in their ability or inability to work." *Young*, 575 U.S. at 229.

With this framework in mind, we consider the evidence in the instant case. First, the parties do not dispute that, as a pregnant woman, Plaintiff satisfied the first element of the prima facie test. *See* 42 U.S.C. § 2000e(k) ("The term[ ] 'because of sex' ... include[s] ... because of or on the basis of pregnancy ...."). Nor do the parties disagree that Plaintiff sought an accommodation in the form of light duty work due to her pregnancy-related restrictions but was denied such accommodation. Consequently, only the fourth prong of the test, whether the employer did accommodate others similar in their ability or inability to work, remains in dispute between the parties.

---

Defendant's remarks. Accordingly, we analyze Plaintiff's claim under the indirect evidence framework.

[6] Traditionally, a plaintiff who sought to prove pregnancy discrimination by circumstantial evidence had to demonstrate the following for a prima facie case: 1) the plaintiff was pregnant and her employer knew of her condition; 2) the plaintiff was qualified for her position; 3) the plaintiff suffered an adverse action; and (4) there is some nexus  between her pregnancy and the adverse employment action that would permit a factfinder to infer unlawful discrimination. *C.A.R.S.*, 527 F.3d at 366 (3d Cir.).

Defendant argues that Plaintiff cannot identify anyone who it accommodated who was similarly situated to her. (ECF No. 38 at 7.) Specifically, Defendant claims that Plaintiff's restrictions materially differed from those of Brooks and Reyes, the two individuals Defendant accommodated with light duty while Plaintiff was out on FMLA leave. *Id.* While Plaintiff's doctor prohibited her completely from bending or climbing, Brooks and Reyes were able to do so infrequently. (ECF No. 34-6 at 10.) As maintained by Defendant, the light duty assignments provided to Brooks and Reyes "required bending and climbing, and bending, climbing, and/or positioning around boxes of all sizes (some even larger than a person) to scan bar codes." *Id.* Thus, because Plaintiff was prohibited from climbing or bending, she was incapable of performing this work. *Id.*

Plaintiff contends that Brooks and Reyes, both non-pregnant employees who sustained work-related injuries during the time that Plaintiff was on leave, were similarly situated in their ability to work. (ECF No. 35 at 16.) Plaintiff further asserts that Brooks and Reyes had, in fact, substantially more severe restrictions than Plaintiff's pregnancy restrictions. *Id.* As noted previously stated, Brooks was not permitted to lift, carry, push, or pull over fifteen (15) pounds, climb, drive a forklift or pallet jack, and was required to limit bending and twisting at the waist and reaching to less than four times per hour. (ECF No. 35-14.) Reyes could not lift, carry, push, or pull over five (5) pounds, drive a forklift or pallet jack, and was required to limit bending and twisting at the waist, reaching, squatting, climbing, and kneeling to less than four times per hour. (ECF No. 35-15.) Both received a modified duty job offer assigning them to scanning pallets.

Under the fourth prong, Plaintiff's "showing is not an onerous burden and does not require that those favored and disfavored were 'similar in all but the protected ways.'" *Dudhi v. Temple Health Oaks Lung Ctr.*, No. CV 18-3514, 2019 WL 426145, at *6 (E.D. Pa. Feb. 4, 2019) (quoting *Young*, 575 U.S. at 228). "While 'similarly situated does not mean identically situated', the plaintiff [and the comparators] must nevertheless be similar in 'all relevant respects.'" *Opsatnik v. Norfolk S. Corp.*, 335 F. App'x 220, 222-23 (3d Cir. 2009) (citations omitted).

In *Young*, a case similar to the one before this Court, the plaintiff worked as a UPS driver which required her to be able to lift up to seventy (70) pounds by herself. *See* 575 U.S. at 215. When she became pregnant, her doctor recommended that she not lift more than

twenty (20) pounds during the first half of her pregnancy and ten (10) pounds during the second half. *Id.* at 214. Young requested a temporary alternative work assignment, however, was told she did not qualify for such assignment and, thus, could not return to work while pregnant as she did not meet the lifting requirements.  *Id.* at 215. UPS therefore required Young to take an unpaid leave of absence until she returned to work, about two months after her baby was born. *Id.*

Young introduced evidence demonstrating that UPS had provided temporary alternative work to several groups of individuals including: employees injured on the job; employees disabled on the job (including those with resulting lifting limitations); those who had lost their Department of Transportation certifications because of a failed medical exam, a lost driver's license (including an employee who had lost his license for driving under the influence), or involvement in a motor-vehicle accident; and some employees who had been disabled off the job. *Id.* at 216–17. The Supreme Court held that, given the evidence presented by Young, a genuine dispute existed as to whether UPS gave more favorable treatment to at least some employees "whose situation cannot reasonably be distinguished from Young's." *Id.* at 231. Recently, the Eleventh Circuit explained that *Young*'s analysis of the fourth element means that, in contrast to Title VII's more general comparator analysis, "the comparator analysis under the PDA focuses on a single criterion—one's ability to do the job."  Durham v. Rural/Metro Corp., 955 F.3d 1279, 1286 (11th Cir. 2020).

Viewing the record in the light most favorable to the Plaintiff, this Court finds that there is a genuine dispute as to whether Plaintiff was similarly situated in her "ability or inability to work" as Brooks and Reyes. As Plaintiff notes, both Brooks and Reyes did have more severe lifting restrictions than her as they could only lift, carry, push, or pull up to fifteen (15) and five (5) pounds, respectively, whereas Plaintiff was limited in these activities to a maximum of twenty-five (25) pounds.  Brooks, similar to Plaintiff, could also not climb. However, whereas Plaintiff could not bend at all, both Brooks and Reyes could do so "less than four times per hour."  Defendant attempts to argue that Plaintiff could not perform the light duty assignments provided to Brooks and Reyes as they "required bending and climbing, and bending, climbing, and/or positioning around boxes of all sizes (some even larger than a person) to scan bar codes." Defendant cites to an August 8, 2017 certification of Sherry Nakata, Operations Manager, where she provided this information, also attesting that this light duty did not meet Plaintiff's

12

restrictions. (ECF No. 34-3 at 108.) Nevertheless, Nakata testified in her October 28, 2019 deposition that, during the period Plaintiff was on FMLA leave, she *could* have performed the duty of helping checkers by scanning pallets "if the position were available at that time." (Nakata Dep. 72:20-73:7.)

Under these circumstances, a reasonable juror could fairly conclude that Plaintiff Was similarly situated in her ability perform light duty work as Brooks or Reyes. Accordingly, because there are genuine issues of material fact, Plaintiff has sufficiently created a triable issue as to whether her Defendant did accommodate others "similar in their ability or inability to work."

### ii. *Defendant's Articulated Reasons*

Because Plaintiff has met her burden of establishing her prima facie case, we turn to Defendant's proffered reasons for failing to accommodate, and subsequently firing, her. To be a legitimate, non-discriminatory reason, it "normally cannot consist simply of a claim that it is more expensive or less convenient to add pregnant women to the category of those whom the employer accommodates." *Young*, 575 U.S. 229. "The employer's burden at this stage is relatively light: it is satisfied if the defendant articulates any legitimate reason for the [adverse employment action]; the defendant need not prove that the articulated reason actually motivated the [action]." *Krouse v. Am. Sterilizer Co*., 126 F.3d 494, 500–01 (3d Cir.1997) (internal citations and quotations omitted).

This Court finds that Defendant has satisfied this "relatively light" burden. Defendant explains that it did not accommodate Plaintiff, and consequently terminated her, because: "Ms. Maldonado-Torres could not physically perform her role as a warehouse operator, CDS could not afford to hire someone to assist her in completing her job duties in her role as warehouse operator, there were no light duty jobs available that met her medical restrictions, and she had exhausted her job-protected leave." (ECF No. 34-6 at 8.) Three of Defendant's justifications for its failure to accommodate and decision to terminate – (1) Plaintiff could not physically perform all essential duties of a warehouse operator, (2) Plaintiff had exhausted her job-protect leave, and (3) CDS could not afford to hire someone to assist Plaintiff  – all stem from its initial reasoning that there were no light duty assignments available that met Plaintiff's restrictions.  Stated differently, these reasons do not independently justify the adverse

employment actions, but do so in combination with the explanation that there were no light duty jobs available.  Thus, this Court focuses on that rationale for failing to accommodate, and ultimately terminating, Plaintiff.

### iii.   Pretext

Because Defendant has articulated a legitimate, nondiscriminatory reason for its failure to accommodate and subsequent decision to terminate Plaintiff, the burden shifts back to the Plaintiff to demonstrate that Defendant's reason is pretextual. *Fuentes v. Perskie*, 32 F.3d 759, 764 (3d Cir. 1994). To defeat summary judgment at the pretext stage, a plaintiff must point to record evidence from which a factfinder could reasonably either: (1) disbelieve the employer's articulated legitimate reason; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action. *Id.* (citations omitted).  In other words, ... a plaintiff who has made out a prima facie case may demonstrate pretext by either (i) discrediting the proffered reasons, either circumstantially or directly, or (ii) adducing evidence, whether circumstantial or direct, that discrimination was more likely than not a motivating or determinative cause of the adverse employment action. *Id.*

"To discredit the employer's proffered reason . . . the plaintiff cannot simply show that the employer's decision was wrong or mistaken, since the factual dispute at issue is whether discriminatory animus motivated the employer, not whether the employer is wise, shrewd, prudent, or competent." *Id.* at 765 (citations omitted). Rather, under the first prong, Plaintiff must "demonstrate such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions" in the proffered reasons "that a reasonable factfinder could rationally find them 'unworthy of credence,' and infer that Defendant did not act for the stated non-discriminatory reasons." *Id.* For the reasons below, we find that there is sufficient evidence in the record to raise a genuine dispute of material fact regarding whether Defendant's justification is pretextual.

First, Plaintiff testified in her deposition that, during her January 8, 2015 meeting with Nakata and Passaro, Nakata informed her that the reason they could not accommodate her request was that Defendant granted light duty only to those who sustained work-related injuries and that, because pregnancy was something personal, they would not accommodate her request for a "personal reason." (ECF No. 35-1 ¶ 46.) Plaintiff further stated that Passaro confirmed this statement. (ECF No. 35-1 ¶¶  16, 46.) Martha Vargas testified that, during her entire employment

as HR Coordinator, she could not think of an occasion on which Defendant could not provide a work assignment to an employee with restrictions, nor could see remember an occasion on which an employee was accommodated for an injury that occurred outside of work. (ECF No. 35-1 ¶ 27.)

Second, Plaintiff has pointed to inconsistencies in Nakata's explanation of whether there was, in fact, no light duty assignment available for Plaintiff. As Operations Manager, Nakata testified that, when evaluating whether there was work to give to an employee with restrictions, Vargas would indicate what the restrictions were and Nakata would then inform Vargas if there was any light duty to meet those restrictions. (Nakata Dep. 25:1-14.) To determine what light duty was available, Nakata would check with supervisors, production managers, and customer service managers. (*Id.* at 26:1-8.) As previously noted, when Plaintiff first told Nakata of her twenty-five (25) pound lifting restriction, on January 8, 2015, Nakata immediately told her that Defendant did not have light duty assignments available to accommodate Plaintiff's restrictions. (ECF No. 34-1 ¶ 46; ECF No. 35-1 ¶ 46.) In her deposition, Nakata stated that, even though she knew during the meeting that there were no light duty assignments available for Plaintiff, she verified this assertion by checking with the warehouse managers and supervisors afterwards. (ECF No. 34-1 ¶¶ 46-47.) When Plaintiff returned to Nakata's office on January 12, 2015 to pick up paperwork, Plaintiff testified that Nakata informed her that FMLA leave was the only option Defendant could provide to Plaintiff as Defendant could not accommodate Plaintiff's light duty request due to her "personal situation" of pregnancy. (ECF No. 35-1 ¶ 52.) Though Plaintiff stated that she told Nakata that she did not want to take leave, Nakata could not recall whether there was any light duty work available for Plaintiff on the day she gave her the paperwork nor does she recall checking whether any such work was available. (ECF No. 35-1 ¶ 19, 52.)  Finally, after Plaintiff's FMLA leave expired, Travis Gaito emailed Nakata asking whether there was any work that Plaintiff could perform pursuant to her restrictions to which Nakata responded that was no available work. (ECF No. 44 at 10.) During Nakata's deposition, she could not recall any of the steps she took to evaluate whether there was work available that could meet those restriction. (ECF No. 35-1 ¶ 32; Nakata Dep. 75:6.) Altogether, this Court finds that Plaintiff has offered sufficient evidence so that a reasonable factfinder could rationally find Defendant's justification – that it did not have light duty assignments available that met Plaintiff's restrictions – unworthy of credence.

Addressing the second prong of *Fuentes*, a plaintiff can demonstrate pretext if she can demonstrate that discrimination "was more likely than not a motivating or determinative cause of the adverse employment action." *Fuentes*, 32 F.3d at 762. Pretext can be shown this way by producing evidence that: 1) the employer has previously subjected the plaintiff to unlawful discriminatory treatment; 2) the employer has discriminated against other members of the plaintiff's protected class or other protected categories of persons; or 3) the employer has treated other, similarly situated persons not of his protected class more favorably. *See id.* at 365. For the reasons discussed in this Court's evaluation of Plaintiff's prima facie case, we find that Plaintiff has raised a genuine issue of material fact on this ground as well. As noted above, the fourth prong of Plaintiff's prima facie case requires that she demonstrate that Defendant did accommodate others "similar in their ability or inability to work." *Young*, 575 U.S. at 229. Plaintiff has presented sufficient evidence to establish a genuine issue of material fact as to whether Brooks and Reyes were similarly-situated in their ability to work, and therefore, treated more favorably when Defendant accommodated them with light duty assignments.

For the foregoing reasons, this Court finds that there exists genuine issues of material fact as to whether Defendant discriminated against Plaintiff because of or on the basis of pregnancy in violation of Title VII and the PHRA. Accordingly, Defendant's motion for summary judgment is denied on this claim.

## B. **Retaliation**

Plaintiff also maintains that Defendant retaliated against her by terminating her employment, in violation of Title VII and the PHRA.[7] The PHRA makes it unlawful for an employer to "discriminate in any manner against any individual because such individual has opposed any practice forbidden by [the PHRA], or because such individual has made a charge, testified or assisted, in any manner, in any investigation, proceeding or hearing under this [the PHRA]. 43 Pa. Stat. Ann. § 955. Title VII similarly prohibits an employer from "discriminat[ing] against any of his employees . . . because he has opposed any practice made an unlawful employment practice by [Title VII], or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under [Title

---

[7] PHRA retaliation claims are analyzed under the same framework as retaliation claims under Title VII. *Vanderveer v. Fedex Ground Package Sys., Inc.*, No. 16-1979, 2017 WL 467631, at *5 (E.D. Pa. Feb. 3, 2017).

VII].” 42 U.S.C. § 2000e–3. Retaliation claims under the PHRA and Title VII are both subject to the same burden-shifting analysis that applied to Plaintiff's discrimination claim. *See Neidigh v. Select Specialty Hosp.-McKeesport*, 664 F. App'x 217, 220 (3d Cir. 2016) (explaining that retaliation claims under Title VII and PHRA are subject to the same burden-shifting framework as discrimination claims).

### i.  *Prima Facie Case*

In order to establish a prima facie case of retaliation, Plaintiff must show that: “(1) she engaged in activity protected by Title VII; (2) the employer took an adverse employment action against her; and (3) there was a causal connection between her participation in the protected activity and the adverse employment action.” *Moore v. City of Philadelp*hia, 461 F.3d 331, 340–41 (3d Cir. 2006)(quoting *Nelson v. Upsala Coll.*, 51 F.3d 383, 386 (3d Cir.1995)). Defendant contests the first and third prongs of the test.

### 1.  Protected Activity

“With respect to ‘protected activity,’ the anti-retaliation provision of Title VII protects those who participate in certain Title VII proceedings (the ‘participation clause’) and those who oppose discrimination made unlawful by Title VII (the ‘opposition clause’).” *Id.* at 341 (quoting *Slagle v. Cty. of Clarion*, 435 F.3d 262, 266 (3d Cir. 2006)). Protected “opposition” activity includes an employee's filing of formal charges of discrimination against an employer as well as “informal protests of discriminatory employment practices, including making complaints to management.” *Daniels v. Sch. Dist. of Phila.*, 776 F.3d 181, 193 (3d Cir. 2015) (citations omitted). In determining whether a plaintiff adequately opposed discrimination, “we look to the message being conveyed [by a plaintiff] rather than the means of conveyance.” *Curay-Cramer v. Ursuline Acad. of Wilmington, Del., Inc.*, 450 F.3d 130, 135 (3d Cir. 2006). “The complaint must allege that the opposition was to discrimination based on a protected category. . . .” *Daniels*, 776 F.3d at 193 (citations omitted). When an employee opposes the employer's activity, “the employee must hold an objectively reasonable belief, in good faith, that the activity they oppose is unlawful under Title VII.” *Moore*, 461 F.3d at 341 (3d Cir. 2006).

Defendant contends that Plaintiff did not engage in protected activity because, under Title VII and the PHRA, a request for an accommodation alone is not protected activity in opposition to discrimination. (ECF No. 34-6 at 12.) Plaintiff responds that she not only requested

an accommodation, but filed a charge of discrimination with the Pennsylvania Human Relations Commission and also opposed unlawful discrimination on two occasions. (ECF No. 35 at 23.) First, on January 12, 2015 when she received FMLA documentation, Plaintiff informed Nakata that she did not want to take a leave of absence. *Id.* Second, on January 26, 2015, Plaintiff asked Vargas as to why she was being made to go on leave despite being able to work. *Id.* Plaintiff argues both of these instances constitute protected activity under Title VII as she "clearly opposed Defendant's discriminatory decision not to accommodate her and to place her on forced leave." *Id.*

We first consider Plaintiff's two referenced complaints to determine if they can amount to "informal protests of discriminatory employment practices" that would qualify as protected opposition activity. In *Swanger-Metcalfe v. Bowhead Integrated Support Servs., LLC*, the plaintiff, a pregnant automotive worker, was instructed by her physician to work only in well-ventilated areas, therefore precluding her from working in the "sand room." No. 1:17-CV-2000, 2019 WL 1493342, at *2 (M.D. Pa. Mar. 31, 2019). A human resources officer later advised the plaintiff's shift leader that she would be sent home if she did not agree to work in the sand room. *Id.* In response, the plaintiff immediately met with both the human resources officer and shift leader to "seek clarification" and stated that she was told that pregnancy was not a disability and that she could either work in the sand room or take leave under the FMLA. *Id.* The plaintiff was further informed that she could not be relocated to a different position even though she alleged that other similarly situated employees were routinely moved to different positions within the facility. *Id.* The plaintiff argued that she engaged in protected activity because she "protested [Defendant's] unlawful conduct at the time they forced her out of work on unpaid leave." *Id.* at *2. The Court found that the plaintiff did not adequately allege facts that support a reasonable inference that she participated in protected activity because she did not assert that she sought the meeting to complain of pregnancy discrimination or sex discrimination. *Id.*

In Plaintiff's deposition, when asked whether, on January 12th, she told Nakata that she did not want to take a leave of absence Plaintiff responded "correct." (Maldonado Dep. 82:3-5.) When further questioned as to whether she told anyone else that she did not want to take a leave of absence she responded: "[w]hen I gave [the FMLA paperwork] to Martha Vargas, I inquired why I have to do this while I could work." (*Id.* 82:10-15.) Based on the finding in *Swanger-Metcalfe*, this Court concludes that these two statements alone do not amount to

protected opposition activity. It must be "possible to discern from the context of the statement that the employee opposes an unlawful employment practice." *Curay-Cramer v. Ursuline Acad. of Wilmington, Delaware, Inc.*, 450 F.3d 130, 135 (3d Cir. 2006)(citing *EEOC v. Crown Zellerbach Corp.*, 720 F.2d 1008, 1012–13 (9th Cir.1983)). Here, where Plaintiff told two managers that she did not want to take FMLA leave because she believed she could work, the statements did not directly accuse defendant of engaging in pregnancy discrimination.

Notwithstanding the conclusion above, we find that Plaintiff unequivocally engaged in protected activity by filing a charge of discrimination with the Pennsylvania Human Relations Commission. Defendant does not contest that such activity is protected under Title VII, but claims that Plaintiff "for the first time in this case… argues in her Opposition that CDS retaliated against her for filing a charge of discrimination with the EEOC." (ECF No. 28 at 10.) Defendant further maintains that Plaintiff "did not allege any facts related to such a charge in her complaint" and, thus, urges the Court to not consider "this new factual theory of liability." *Id.* Plaintiff responds that she is not asserting a "new theory of liability" as she asserted a claim of retaliation in the Complaint. Plaintiff also adds that the charge of discrimination was served on Defendant and subsequently produced in discovery. (ECF No. 44 at 3.)

Defendant is correct that Plaintiff cannot introduce new legal theories or claims through an opposition to a motion for summary judgment. *See Phillips v. SEPTA, No. CV 16-0986, 2018 WL 827440*, at *4 (E.D. Pa. Feb. 12, 2018) (citing *myService Force, Inc. v. Am. Home Shield, No. 10-6793*, 2013 WL 180287, at *12 (E.D. Pa. Jan. 17, 2013) ("Federal pleading standards do not allow a party 'to raise new claims at the summary judgment stage'") (internal citation omitted); *see also Bell v. City of Phila.*, 275 Fed. Appx. 157, 160 (3d Cir. 2008) (non-precedential) ("A plaintiff 'may not amend his complaint through arguments in his brief in opposition to a motion for summary judgment.'")(citations omitted).  However, a plaintiff may introduce new facts into the record at the summary judgment stage.  *See Bell Atl. v. Twombly*, 550 U.S. 544, 563 (2007) ("[O]nce a claim has been stated adequately, it may be supported by showing any set of facts consistent with the allegations in the complaint.").

Plaintiff's assertion that Defendant retaliated against her for filing a charge of discrimination is not a new theory of liability, as argued by the Defendant. Under Federal Rule of Civil Procedure 8(a)(2), a pleading that states a claim for relief must contain a short and plain

statement of the claim showing that the pleader is entitled to relief. Fed. R. Civ. P. 8(a)(2). Specific facts are not necessary, however, the statement must give the defendant fair notice of what the claim is and the grounds upon which it rests. *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (quoting *Conley v. Gibson*, 355 U.S. 41, 47 (1957)).  A plaintiff must plead "enough facts to state a claim to relief that is plausible on its face." *Id.* at 570. Plaintiff's Complaint alleges that Defendant "terminated [her] employment based on her sex and pregnancy and in retaliation for requesting an accommodation for her pregnancy." (ECF No. 1¶ 17.) Though Plaintiff does not specifically reference the charge of discrimination, the charge itself was filed in response to Defendant's failure to accommodate Plaintiff. Thus, the suggestion that that Defendant's failure to accommodate Plaintiff resulted in her filing a complaint with the PHRC, an act upon which Defendant then retaliated by terminating Plaintiff, is consistent with the theory of retaliation on which Plaintiff has relied throughout the duration of the lawsuit.

Defendant lastly argues that, even if this Court considers Plaintiff's claim that Defendant terminated her employment in retaliation for filing her charge of discrimination – as we have done – Defendant is entitled to summary judgment because Plaintiff did not exhaust her administrative remedies under Title VII or the PHRA. (ECF No. 38 at 11.) Because "there is no evidence that [Plaintiff] filed a charge with the EEOC or the PHRC alleging that [Defendant] terminated her employment in retaliation for the filing of her February 5, 2015 EEOC charge," Defendant maintains that the court lacks subject matter jurisdiction over this claim. *Id.* Plaintiff replies that, subsequent to filing her February 5, 2015 charge, and after her termination, she filed a second charge on July 14, 2015. (ECF No. 44 at 4.) Though she did not expressly reference retaliation in her July charge, Plaintiff maintains that "such a claim was within the scope of the PHRC's investigation given the fact that the Plaintiff filed a previous Charge . . . five months prior." *Id.*

A plaintiff must exhaust all administrative remedies prior to bringing a Title VII claim. *Robinson v. Dalton*, 107 F.3d 1018, 1020 (3d Cir.1997). The administrative exhaustion requirement, however, "is tempered by a fairly liberal construction given to EEOC charges." *Schouten v. CSX Transp., Inc.*, 58 F. Supp. 2d 614, 616 (E.D. Pa. 1999)(citing *Polay v. West Co.*, 629 F.Supp. 899, 901 (E.D.Pa.1986)). The failure to check a particular box on an EEOC charge is not necessarily indicative of a failure to exhaust the mandatory administrative remedies. *Id.* (citing *Doe v. Kohn Nast & Graf*, P.C., 866 F.Supp. 190, 196 (E.D.Pa.1994)). If a plaintiff brings

suit based upon allegations that were not included in the EEOC charge, the relevant test in determining whether the plaintiff was required to exhaust her administrative remedies "is whether the acts alleged in the subsequent Title VII suit are fairly within the scope of the prior EEOC complaint, or the investigation arising therefrom." *Antol v. Perry*, 82 F.3d 1291, 1295 (3d Cir.1996) (quoting *Waiters v. Parsons*, 729 F.2d 233, 237 (3d Cir.1984)).

In effort to define the scope of a reasonable EEOC investigation, courts have allowed claims not specifically mentioned in the EEOC charge "where there was a close nexus between the facts supporting the claims raised in the charge and those in the complaint." *Pourkay v. City of Philadelphia*, No. CIVA 06-5539, 2009 WL 1795814, at *5 (E.D. Pa. June 23, 2009)(citing *Howze v. Jones & Laughlin Steel Corp.*, 750 F.2d 1208, 1212 (3d Cir.1984)). In the present case, we find that the retaliation claim was within the scope of the PHRC's investigation considering that Plaintiff filed a charge for discrimination based on Defendant's failure to accommodate her pregnancy and, only five months later, filed a subsequent charge on the same facts noting her termination.

2.   Causal Connection

Though Defendant acknowledges that it took an adverse employment action against Plaintiff by terminating her, it contends that Plaintiff cannot establish that there was a causal connection between her filing of the charge of discrimination and her termination. A court will consider "'a broad array of evidence' in determining whether a sufficient causal link exists [for a plaintiff] to survive a motion for summary judgment." *Daniels,* 776 F.3d at 196 (citations omitted.) The requisite causal connection can be established: (1) by the temporal proximity between the protected activity and the adverse employment action, (2) by circumstantial evidence of a "pattern of antagonism" following the protected conduct, or (3) where the proffered evidence, looked at as a whole, suffices to raise the inference.  *Kachmar v. SunGard Data Sys., Inc*., 109 F.3d 173, 177 (3d Cir. 1997).

For temporal proximity alone to establish causation between the protected activity and retaliatory action, it must be "unduly suggestive." *LeBoon v. Lancaster Jewish Cmty. Ctr. Ass'n*, 503 F.3d 217, 232 (3d Cir.2007). Here, approximately three months passed between Plaintiff's filing of her charge of discrimination, on February 5, 2015, and her eventual termination, on May 13, 2015. The Third Circuit has previously held that "a gap of three months

between the protected activity and the adverse action, without more, cannot create an inference of causation and defeat summary judgment." *Id.* at 233 (citing *Clark County School Dist. v. Breeden*, 532 U.S. 268, 273–74 (2001)). Thus, we look to whether there is other evidence in the record sufficient for a reasonable factfinder to determine that Plaintiff's termination was caused by the filing of her charge of discrimination. Among the kinds of evidence that a plaintiff can proffer are intervening antagonism or retaliatory animus, inconsistencies in the employer's articulated reasons for terminating the employee, or any other evidence in the record sufficient to support the inference of retaliatory animus. *Id.* at 232-33 (citing *Farrell v. Planters Lifesavers Co.*, 206 F.3d 271, 284 (3d Cir.2000)).

 Viewing the record on the whole, this Court finds Plaintiff has presented sufficient evidence to sustain an inference of retaliation. As noted in our discussion of Plaintiff's discrimination claim, inconsistencies exist in Defendant's explanations for terminating her. *See supra*, Section IV(A)(iii). In the termination letter sent to Plaintiff, Defendant explained that it "did not have any open positions" that she was qualified for that also met her restrictions. (ECF No. 35-9.) However, when Plaintiff first asked for an accommodation, she testified that both Nakata and Passaro stated that light duty positions were granted only to those who sustained work-related injuries and that, because pregnancy was something personal, they would not accommodate her request for a personal reason. *See supra*, Section IV(A)(iii) Further, Nakata provided inconsistent explanations as to whether she took any steps to determine whether light duty was available for Plaintiff and whether Plaintiff could have performed light duty assignments provided to two similarly situated employees just prior to Plaintiff's termination. *See supra*, Section IV(A)(iii). When Gaito emailed Nakata on May 8, 2015 asking if there was any work available for Plaintiff that met her restrictions, Nakata responded only eight minutes later that there were not. *Id.* Despite this response, Nakata testified during her deposition that she could not recall any of the steps she took to evaluate whether there was work available at that time that met Plaintiff's restrictions. *Id.*

 In addition to these statements, Martha Vargas testified that, during her entire employment as HR Coordinator, she could not think of an occasion on which Defendant could not provide a work assignment to an employee with restrictions, nor could see remember an occasion on which an employee was accommodated for an injury that occurred outside of work. (ECF No. 35-1 ¶ 27.) Passaro also recalled an employee who, after having multiple back

surgeries, was granted light duty for a significant period of time. (Passaro Dep. 40:10-41:12.) The employee was restricted to lifting about "two pounds," he could not "really stand," and had to be driven "a lot of times" on a golf cart "between the office and the door." (*Id.*  41:20-42:24.)

Overall, the proffered evidence, viewed in its entirety, suffices to raise an inference of retaliation. A reasonable factfinder could conclude that, after Plaintiff filed her charge of discrimination while on FMLA leave, Defendant decided to terminate her because of that action, and not because it could not accommodate her with light duty assignments. Accordingly, considering the evidence in the light most favorable to Plaintiff, we find that she has established a prima facie case of retaliation under Title VII and the PHRA.

*ii.  Defendant's Articulated Reasons and Pretext*

As previously discussed in this Court's analysis of Plaintiff's discrimination claim, Defendant maintains that it terminated Plaintiff because (1) Plaintiff could not physically perform her role as a warehouse operator, (2) Defendant could not afford to hire someone to assist her in completing her job duties in her role as warehouse operator, (3) there were no light duty jobs available that met Plaintiff's medical restrictions, and (4) Plaintiff had exhausted her job-protected leave. For the same reasons set forth in Sections IV(A)(ii)-(iii), we find that Defendant has articulated legitimate, nondiscriminatory reasons for terminating Plaintiff, however, Plaintiff has offered sufficient evidence to establish a genuine issue of material fact as to whether the stated reasons are pretextual. Therefore, Defendant's motion for summary judgment on Plaintiff's retaliation claim is denied.

## V.  **CONCLUSION**

For the foregoing reasons, this Court finds that Plaintiff has come forth with evidence sufficient to raise a genuine dispute of material fact as to whether Defendant discriminated against her on the basis of her pregnancy and retaliated against her for filing a charge of discrimination. Accordingly, Defendant's Motion for Summary Judgment is **DENIED.**